COURT OF APPEALS
DECISION
DATED AND FILED

October 28, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2019AP1866**

STATE OF WISCONSIN

Cir. Ct. No.  2016CV70

IN COURT OF APPEALS
DISTRICT IV

---

MARK B. PATTINSON,

  PLAINTIFF-APPELLANT,

UNIVERSITY OF WISCONSIN HOSPITAL AND CLINICS,

  PLAINTIFF,

FORWARD HEALTH, DEAN HEALTH PLAN AND ARTISAN TRUCKERS CASUALTY COMPANY P/K/A PROGRESSIVE INSURANCE COMPANY,

  SUBROGATED-PLAINTIFFS,

  V.

RICHARD H. UBERSOX,

  DEFENDANT-RESPONDENT,

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY P/K/A STATE FARM INSURANCE,

  DEFENDANT.

---

APPEAL from a judgment of the circuit court for Lafayette County: JAMES R. BEER, Judge. *Affirmed*.

Before Blanchard, P.J., Kloppenburg, and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Mark B. Pattinson appeals a final judgment, entered on a jury verdict, dismissing his personal injury suit against Richard H. Ubersox. At trial, each party argued that the other was negligent in causing a vehicular accident, with Ubersox presenting evidence that Pattinson's driving reaction time was delayed because of alcohol impairment. On appeal, Pattinson argues that the circuit court erroneously exercised its discretion by: (1) giving a jury instruction setting forth the presumptive effect of chemical tests for intoxication resulting from alcohol consumption; (2) admitting the testimony of Ubersox's toxicologist expert witness, who relied on the results of Ubersox's hospital blood test; and (3) prohibiting Pattinson from claiming future medical expenses. We affirm, concluding that Pattinson has not demonstrated error in connection with the jury instruction and that he has forfeited his challenge to the admissibility of Ubersox's expert witness testimony. Because we uphold the judgment dismissing all claims against Ubersox, we do not reach Pattinson's argument regarding medical expenses.

## BACKGROUND

¶2 On September 21, 2013, at approximately 8:25 p.m., a collision occurred on State Highway 23 near Darlington, Wisconsin, between Pattinson's

motorcycle and Ubersox's pick-up truck. Pattinson was injured and taken to the emergency department of Memorial Hospital in Darlington.

¶3 Pattinson sued Ubersox, claiming that Ubersox's negligent failure to yield caused the crash. The case proceeded to a five-day jury trial. Pattinson testified to the following version of events. Pattinson was driving his motorcycle in the southbound lane of Highway 23, at or below the 55 mph speed limit. Pattinson saw Ubersox's truck emerge from a driveway ahead of Pattinson and on his right. Ubersox, without stopping, turned left out of the driveway and into the northbound lane of Highway 23. Pattinson feared that he was going to hit Ubersox; he swerved left and right, but could not avoid Ubersox. Pattinson further testified to having consumed alcohol in the hours before the collision.

¶4 Pattinson also presented the expert testimony of Jeffrey Peterson, an accident reconstructionist. Peterson's testimony included the following. At the time of impact, Ubersox's truck was "at an angle" and mainly in the northbound lane, but the "left rear corner [of the truck was] still in the southbound lane a little bit." Pattinson's motorcycle crossed the center line just prior to collision and Pattinson "would have avoided the impact" if he "had braked and simply stayed in his lane." Pattinson started to skid his motorcycle just before the crash, at which time Pattinson was traveling 54-62 miles per hour.

¶5 Ubersox testified to the following version of events. Ubersox stopped at the end of his driveway, looked both ways, and saw Pattinson's headlight to the left. It was not until Ubersox started turning left, however, that he realized that the motorcycle was traveling faster than he expected. Ubersox sped up to try to get out of the way, at the same time realizing that Pattinson was

veering to the left to try to avoid his truck. Pattinson hit Ubersox once Ubersox was already in the northbound lane and driving north.

¶6 A passenger in Ubersox's truck also testified, and her testimony was consistent with Ubersox's.

¶7 Ubersox called Laura Liddicoat, a toxicologist, to testify about Pattinson's approximate blood alcohol concentration (BAC) at the time of the collision and its potential effect on his reaction time. Among other materials, Liddicoat reviewed Pattinson's Memorial Hospital medical record and a transcript from his deposition, in which he testified about the details of his food and alcohol consumption before the crash.

¶8 Liddicoat testified to the following. She based her analysis on the result of an alcohol test from a Memorial Hospital blood sample drawn at 9:10 p.m., approximately 45 minutes after the collision. This was a medical and not a "legal" or forensic test (that is, the blood was not drawn and tested for a law enforcement purpose and according to that standard). Therefore, Liddicoat approximated the corresponding forensic test result using a three-step process. She first took the hospital test result and converted that measurement to grams per deciliter, the unit ratio used for BAC in the pertinent Wisconsin Statutes. *See* WIS. STAT. § 885.235(1)(a) (2019-20).[1] Second, because a forensic BAC measurement tests the "whole blood," rather than the serum or plasma "routinely" tested in hospitals (including at Memorial Hospital), Liddicoat reduced her number by

---

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted. WISCONSIN STAT. § 885.235(1)(a) refers to "grams per 100 milliliter," which is equivalent to grams per deciliter.

approximately 15%, to convert the hospital serum/plasma measurement to the whole-blood BAC measurement, yielding a result of between .080 to .086 grams per deciliter at the time of the blood test. Third, Liddicoat accounted for the elimination of alcohol from Pattinson's blood between the times of the collision and the blood test. She also accounted for the possibility that, at the time of the collision, Pattinson may not have absorbed into his bloodstream all of the alcohol he had consumed.

¶9      Liddicoat determined that Pattinson's BAC at the time of the collision was between .08 and .094 grams per deciliter and "would have been about .09." Based on her review of the medical literature on alcohol use and reaction times, Liddicoat concluded that this BAC would have caused Pattinson to "experience[] a delay in his complex reaction time" of at least .7 seconds.

¶10      Ubersox also called Curtis Beloy, an accident reconstructionist, whose testimony included the following. Beloy attributed fault to Pattinson, drawing three conclusions about how Pattinson could have avoided the collision. First, Pattinson would have had enough time to brake and stop had he been traveling 55 mph, the speed limit, as opposed to what Beloy calculated to be at least 68.5 mph. Second, Beloy concluded that, at the time of impact, Ubersox was completely over the center line and in the northbound lane. Therefore, the collision would not have happened if Pattinson had remained in his lane. Third, Pattinson could have avoided the collision had he reacted .7 seconds sooner to his noticing Ubersox pulling out of the driveway. Therefore, accepting Liddicoat's testimony that the alcohol delayed Pattinson's reaction time, the collision would not have occurred if Pattinson had been sober.

¶11    Over Pattinson's objection, the circuit court gave the jury pattern instruction WIS JI—CIVIL 1008, which sets forth the presumptive effect of chemical tests for intoxication.  The jury returned a special verdict finding Pattinson 70% negligent and Ubersox 30% negligent, meaning that, under Wisconsin's comparative negligence statute, Pattinson was not entitled to damages.  *See* WIS. STAT. § 895.045(1).  The circuit court entered judgment on the verdict in favor of Ubersox and dismissed the action.

## DISCUSSION

I.  *Pattinson Has Not Demonstrated that the Circuit Court Erred in Giving WIS JI—CIVIL 1008 to the Jury.*

¶12    Although a circuit court has "broad discretion" to give a jury instruction, the "[f]acts of record must support the instruction and the instruction must correctly state the law." ***Kochanski v. Speedway SuperAmerica, LLC***, 2014 WI 72, ¶10, 356 Wis. 2d 1, 850 N.W.2d 160.  "We independently review whether these two criteria are met." ***Id.***

¶13    Pattinson argues that the circuit court erred in giving WIS JI—CIVIL 1008 (Intoxication:  Chemical Test Results).  That instruction provides:

> The results of a chemical test for intoxication have been received in evidence.
>
> If you find there was an alcohol concentration of 0.[0]8 or more at the time of the test, you should find from that fact alone that the person was under the influence of an intoxicant at the time in question, unless you are satisfied to the contrary from other evidence.

Pattinson argues that this instruction does not apply here because it properly pertains only to samples drawn and tested according to WIS. STAT. § 343.305, which sets forth forensic testing procedures and provides for the use of forensic

6

test results at trial. Pattinson argues that the hospital blood test does not meet the forensic requirements of § 343.305, and that as a result, the jury should not have been instructed that it could presume that he was under the influence at the time of the collision based on the hospital test.[2] As we explain, Pattinson's argument is based on a misinterpretation of the pertinent statutes.

¶14 WISCONSIN JI—CIVIL 1008 is the pattern jury instruction for WIS. STAT. § 885.235, "Chemical tests for intoxication." As pertinent here, § 885.235(1g) provides:

> In any action or proceeding in which it is material to prove that a person was under the influence of an intoxicant or had a prohibited alcohol concentration … while operating or driving a motor vehicle …, evidence of the amount of alcohol in the person's blood at the time in question, **as shown by chemical analysis of a sample of the person's blood** … is admissible on the issue of whether he or she was under the influence of an intoxicant or had a prohibited alcohol concentration … if the sample was taken within 3 hours after the event to be proved. The chemical analysis shall be given effect as follows without requiring any expert testimony as to its effect:
>
> ….
>
> (c) The fact that the analysis shows that the person had an alcohol concentration of 0.08 or more is prima facie evidence that he or she was under the influence of an intoxicant and is prima facie evidence that he or she had an alcohol concentration of 0.08 or more.

(Emphasis added.). *See also* § 885.235(1)(a) (defining alcohol concentration). Thus, § 885.235(1g)(c) creates a presumption, based on a driver's BAC as shown by chemical analysis of a sample of a driver's blood, that the driver was under the influence of an intoxicant or operating with a BAC of .08 or more, "shift[ing] the

---

[2] The hospital test results were received into evidence without objection.

burden to the opposing party to overcome or rebut the presumption." WIS JI—CIVIL 1008 (cmt.).[3]

¶15    WISCONSIN STAT. § 885.235 does not define "chemical analysis" or "chemical test." However, Pattinson directs us to WIS. STAT. § 343.305, "Tests for intoxication; administrative suspension and court-ordered revocation." This statute sets forth testing and laboratory credentialing requirements for blood, breath, and urine alcohol and controlled substance testing. *See* § 343.305(6). The results of tests "administered in accordance with this section are admissible" at

> the trial of any civil or criminal action or proceeding arising out of the acts committed by a person alleged to have been driving or operating a motor vehicle while under the influence of an intoxicant … or having a prohibited alcohol concentration … on the issue of whether the person was under the influence of an intoxicant … or [on] any issue relating to the person's alcohol concentration.

Sec. 343.305(5)(d). Paragraph 343.305(5)(d) specifies that "[t]est results shall be given the effect required under [WIS. STAT. §] 885.235."

¶16    Pattinson argues that WIS. STAT. § 343.305(5)(d) provides the only statutory basis for treating certain blood alcohol measurements—the results of samples drawn and tested under § 343.305(6)—as "prima facie evidence [of being] under the influence of an intoxicant." *See* WIS. STAT. § 885.235(1g)(c). In other words, Pattinson argues that the phrase "results of a chemical test" used in

---

[3] The comment to WIS JI—CIVIL 1008 states that WIS. STAT. § 885.235(1g)(c) "makes a chemical test showing … of [0.08] (the basic fact) 'prima facie evidence' of being under the influence of an intoxicant (the other fact)." WIS JI—CIVIL 1008 (cmt.). To be precise, it is WIS. STAT. § 903.01 ("Presumptions in general") that "makes this statutory provision a presumption." WIS JI—CIVIL 1008 (cmt.).

WIS JI—CIVIL 1008 denotes *only* the results of a test performed under § 343.305(6) and cannot cover the results of his Memorial Hospital test.

¶17    The problem with this reasoning is that WIS. STAT. § 885.235(1g) does not limit the "under the influence" presumption to a specified subset of tests results. By the statute's terms, "prima facie evidence that [a person] was under the influence of an intoxicant" exists whenever a "chemical analysis of a sample of the person's blood" "shows that the person had an alcohol concentration of 0.08 or more." Sec. 885.235(1g)(c). The statute does not preclude the Memorial Hospital blood test at issue here from being treated as a "chemical test" or "chemical analysis." This supports Ubersox's position that the *sole fact* that "tests administered pursuant to WIS. STAT. § 343.305 receive the benefit of the statutory presumption in WIS. STAT. § 885.235" does not mean "that *only* tests administered pursuant to [§] 343.305 are entitled to the presumption." We decline to read into § 885.235(1g) a condition that the legislature did not include. *See **Brauneis v. LIRC***, 2000 WI 69, ¶27, 236 Wis. 2d 27, 612 N.W.2d 635 ("We should not read into the statute language that the legislature did not put in."). Accordingly, Pattinson has not shown that the court erred in giving WIS JI—CIVIL 1008.[4]

---

[4] We also note that, in seeking to prove Pattinson's BAC at the time of the collision, Ubersox did not rely exclusively on the instruction's presumptive effect. Importantly, the instruction—and WIS. STAT. § 885.235(1g)(c)—permit the results of blood tests taken "within 3 hours after the event to be proved" to be given the prima facie effect of intoxication at the time of the event, without the need for expert testimony. *See* WIS. STAT. § 885.235(1g); *see also* WIS JI—CIVIL 1008 (cmt.). If, on the other hand, a sample was not taken within three hours, then "evidence of the amount of alcohol in the person's blood or breath as shown by the chemical analysis is admissible only if expert testimony establishes its probative value and may be given prima facie effect only if the effect is established by expert testimony." Sec. 885.235(3); *see also* WIS JI—CIVIL 1008 (cmt.). Here, Ubersox did not ask the jury to accept the Memorial Hospital blood result as representing Pattinson's blood alcohol level at the time of the collision. Rather, Ubersox presented expert testimony—Liddicoat's extrapolations from the hospital test results— purporting to show that Pattinson's BAC was "about .09" at the time of the collision. This testimony was before the jury regardless of whether it received WIS JI—CIVIL 1008; with or

(continued)

II. *Pattinson Has Forfeited His Challenge to the Admissibility of Liddicoat's Testimony.*

¶18     Pattinson argues that Liddicoat's testimony was "without a foundation" and not "based on 'sufficient facts and data'" because Ubersox did not establish whether "the Memorial [Hospital] analysis and result were accurate and reliable." Pattinson points to numerous facts that the defense "did not establish" about the hospital test results, including the sample's "chain of custody" and "the apparatus used" for testing.[5]

¶19     Although not framed as such, this argument is a ***Daubert***[6] challenge. *See* WIS. STAT. § 907.02(1) (expert witness testimony must be "based upon sufficient facts or data," must be "the product of reliable principles and methods," and must result from the witness's reliable application of these "principles and methods … to the facts of the case"); ***State v. Hogan***, 2021 WI App 24, ¶¶18-19, 23, 397 Wis. 2d 171, 959 N.W.2d 658 (above-quoted portions of § 907.02(1) codify the ***Daubert*** "gatekeeping" standard for admitting expert witness testimony). This challenge, however, was not brought before trial or when the evidence was offered at trial. Pattinson did bring a pretrial motion in limine challenging Liddicoat's testimony, but at that time he argued only that: (1) Liddicoat "does not know and cannot establish the time when the plaintiff's drinking commenced and … finished," and (2) her conclusions did not account for

---

without that instruction, the jury could have reasonably found that Pattinson's BAC was .09 at the time of the collision based on its assessment of Liddicoat's testimony.

⁵ Pattinson also refers to the circuit court's receiving Liddicoat's report into evidence, but because he fails to make any argument regarding Liddicoat's report separate from his argument with respect to her testimony, we do not separately address the report.

⁶ ***Daubert v. Merrell Dow Pharms., Inc.***, 509 U.S. 579 (1993).

the "variable rates of absorption … [and] elimination of alcohol."  It was not until Pattinson's motion after the verdict that he first argued that the hospital's blood collection and testing procedures could not ensure accurate results, potentially undermining the foundation for Liddicoat's extrapolations and conclusions.

¶20    Thus, Ubersox had no opportunity to demonstrate either pretrial or during trial (and the circuit court had no opportunity to rule on) the reliability of Liddicoat's testimony.  We agree with Ubersox that Pattinson has forfeited the distinct challenges he now raises.  *See **State v. Cameron***, 2016 WI App 54, ¶12, 370 Wis. 2d 661, 885 N.W.2d 611 (the failure to raise a ***Daubert*** challenge before trial or when the evidence is offered forfeits the right to challenge the substance of the expert testimony post-trial); WIS. STAT. § 901.03(1)(a) ("Error may not be predicated upon a ruling which admits … evidence unless a substantial right of the party is affected[] and … a timely objection or motion to strike appears of record, stating the specific ground of objection[] if … not apparent from the context.").

## CONCLUSION

¶21    For the reasons stated, we affirm the circuit court's judgment on the verdict dismissing all of Pattinson's claims against Ubersox.

*By the Court.*—Judgment affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)5.